UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:04CV-204-H

MALCOLM T. TURNER, ADMINISTRATOR                                PLAINTIFF
OF THE ESTATE OF SUSANNE R. TURNER

V.

THE SULLIVAN UNIVERSITY                                         DEFENDANT
SYSTEMS, INC.

**MEMORANDUM OPINION**

Plaintiff, Susanne R. Turner ("Turner") filed suit against Defendant, The Sullivan

University Systems Inc. ("Sullivan"), her former employer, for violations of the Kentucky Civil

Rights Act ("KCRA") and the Family and Medical Leave Act ("FMLA").[1]  Turner alleges that

Sullivan violated the KCRA by discriminating against her on the basis of her sex, her pregnancy,

and her disability, and by retaliating against her for engaging in protected activity under the

KCRA.  Turner also alleges that Sullivan violated the FMLA by interfering with her rights under

that act and by retaliating against her for exercising them.  Malcolm Turner has moved to revive

all of the claims originally pled by Susanne Turner.  In addition, Defendant has moved for

summary judgment on each of Turner's claims.  The Court will consider each motion in turn.

---

[1] Turner is now deceased, and her husband, Malcolm T. Turner was appointed administrator of her estate and substituted as the plaintiff in this action.  The Court will refer to Susanne Turner and Malcolm Turner each as "Turner."

I.

Turner was a full-time instructor in English at Sullivan, and was employed in that capacity from 1998 until her termination in December 2003.  From 1993 to 1998 Turner was an adjunct instructor at Sullivan.  After becoming a full-time instructor, Turner usually worked under an employment contract and usually taught five classes per quarter.  Turner also served as Chair of the Sullivan English Department.

In March 2002, Turner took an approved twelve-week FMLA leave to have her first child, and she returned in June 2002.  Upon returning from FMLA leave for the Summer 2002 Quarter, Turner taught four classes: English 101, English 102, English 204, and English 264.  In the Fall 2002 Quarter, Turner taught English 274 and team taught Management 510.[2]  In September 2002, Turner entered into a one-year employment contract with Sullivan to expire on September 30, 2003.

In October 2002, Turner's supervisor, Mike Daniel ("Daniel"), called her at home to ask why she was not attending "Plus Fridays."  Plus Fridays are essentially office hours in which students may seek assistance from instructors, ask questions, make up missed classes, take tests, and get additional help and feedback.[3]  Turner alleges that during the phone call, Daniel shouted at her, asking her "who do you think you are" and "do you think you're special," and that Daniel called Turner "arrogant" and hung up on her.  Daniel told Turner that, notwithstanding the fact

---

[2] Turner taught a total of four courses in the Fall 2002 Quarter.  However, the parties' filings do not name the additional two courses.

[3] Turner's employment contract stated that "the faculty member hereby agrees . . . to be present for Plus Fridays, orientation days, graduation activities, and for additional faculty and other meetings required by [Sullivan] as a continuing condition of employment."  Turner alleges, and Defendant does not appear to dispute, that the only students who attend Plus Fridays are undergraduate students in day courses.  At the time of the incident with Daniel, Turner was teaching only graduate and evening undergraduate courses.

that she was teaching only graduate and evening courses, her position as Chair of the English Department required her to attend Plus Fridays.  Shortly after that conversation, Turner resigned as English Department Chair.  Nevertheless, Daniel continued to insist that she attend Plus Fridays.

In the Winter Quarter of 2003, which began in January 2003, Daniel assigned Turner to teach five English 100 classes, which are remedial courses.  Also in the Winter Quarter of 2003, Sullivan did not offer two electives that Turner usually taught– Introduction to Shakespeare and Introduction to Horror.  Daniel was aware that Turner considered a full load of remedial English courses an undesirable schedule.

On January 22, 2003, Turner was diagnosed with breast cancer.  Turner requested and was granted an FMLA leave to undergo treatment.[4]  When her condition required additional treatment, Dr. James Watkins ("Watkins"), Vice President of Academic Affairs, approved an extension of her leave until June 2003.  Turner returned to work on June 23, 2003, one week before the Summer 2003 Quarter began.  Daniel assigned her five English 101 classes for the Summer 2003 Quarter.  Turner considered this schedule undesirable.

Prior to her return, Turner requested placement in a "smart" classroom, so that she could teach using Microsoft Powerpoint projections.  She was not placed in a smart classroom, but she was given a smart cart, which contained a projector, a VCR, and a computer.  Turner also requested breaks between her classes.  Sullivan granted this request.  Turner also requested a schedule with all of her classes in the same room.  With the exception of one evening course,

---

[4] Under Sullivan's policy regarding FMLA leave, Turner would not yet have been eligible for additional leave, because Sullivan's policy entitles eligible employees to twelve weeks of FMLA leave in a twelve-month period, calculated on a rolling basis.  However, Sullivan approved additional leave for Turner.

Sullivan arranged for this accommodation.  At some point in the Summer 2003 Quarter, Daniel

told Turner that she could not attend a faculty meeting in Lexington, Kentucky at which certain

faculty members were to discuss curriculum issues.

Turner's circumstances become more complicated in late June 2003.  She discovered that

she was five months pregnant; then she learned that her cancer had returned, and she began

chemotherapy treatment.  In late August 2003, Turner learned that she required a premature

caesarian delivery.  This took place on August 28.  In the Summer 2003 Quarter, Turner missed

a total of twelve days of class instruction, including three days when she had surgery and six

days when she had her second child.

Turner's teaching contract expired on September 30, 2003.  In her annual performance

review on October 3, 2003, Daniel again assigned Turner to teach five English 101 classes.  He

also offered her a contract for only six months, as opposed to the usual year, and with only a one

percent pay increase, rather than the customary four to four and one half percent increase.

According to Turner, Daniel told her that the new contract was based on her availability, and that

she use the six months to think about her attitude or seek a new job.  Turner responded that the

contract was illegal and unfair and that she would consult an attorney.

After that meeting, Turner went to see Watkins.  Turner told Watkins that she was upset

about the meeting with Daniel and that she believed the contract was an act of retaliation.

Watkins said that he was concerned about her availability during the prior quarter, and he

testified that the twelve absences were one reason for the contract.  Following the meeting with

Watkins, Turner contacted attorney Mary Maple, who sent a seven-page letter to the president of

Sullivan asserting violations of  the ADA, the FMLA and the KCRA concerning sex and

4

pregnancy discrimination.  Sullivan denied wrongdoing and accused Turner of misconduct.

Turner never signed the six-month contract, and on November 18, 2003, Watkins terminated her employment effective December 19, 2003, the last day of the Fall 2003 Quarter.  Watkins' stated reasons for terminating Turner were poor attitude and/or disloyalty to the institution, and lack of cooperation with college administration and/or other faculty, as well as her refusal to sign the employment contract.  Watkins and Daniel both acknowledged receipt of a letter from Turner's attorney during this time.  Daniel said he believed Turner was serious about a lawsuit.

After her discharge, Turner applied for unemployment benefits, was denied, and successfully appealed.  Much later, in December 2004, Turner also applied for Social Security disability benefits, stating that she became unable to work beginning January 21, 2003 (the date of her diagnosis).  In April 2005, she began receiving benefits.  On June 19, 2005, Turner died of cancer.

## II.

Malcolm Turner has moved to revive all of the claims originally pled by Susanne Turner.  Sullivan argues that the claims under the KCRA and for liquidated damages under the FMLA do not survive the death of Susanne Turner.  For the reasons stated herein, the Court holds that all of the original claims survive.

## A.

Under Ky. Rev. Stat. Ann. § 411.140,

> [n]o right of action for personal injury or for injury to real or personal property
> shall cease or die with the person injuring or injured, except actions for slander,
> libel, criminal conversation, and so much of the action for malicious prosecution
> as is intended to recover for the personal injury.  For any other injury an action

> may be brought or revived by the personal representative, or against the personal
> representative, heir or devisee, in the same manner as causes of action founded on
> contract.

On its face, section 411.140 seems to decide the issue, as a claim under the KCRA is plainly not one for slander, libel, criminal conversation, or malicious prosecution. Sullivan argues that the KCRA claims are in essence claims for injury to reputation, but it has cited no cases in support of its position, nor has the Court found any such cases. Kentucky courts do not appear to have addressed whether KCRA claims survive a plaintiff's death. In the absence of guidance from Kentucky courts, this Court will not read into section 411.140 an intention that seems contrary to its plain language. Accordingly, Turner's KCRA claims survive.

As to injunctive relief under the KCRA, such relief is plainly moot in the form of reinstatement. However, Turner also seeks general injunctive relief "prohibiting Sullivan from engaging in the unlawful practice which is the subject of this action." As discussed above, under Ky. Rev. Stat. Ann. § 411.140, all claims survive unless they are ones specifically enumerated in the statute. Accordingly, Turner's claim for general injunctive relief survives.

### B.

The FMLA claims present a somewhat closer question. Although the parties agree that the cause of action under the FMLA survives, no court in the Sixth Circuit or elsewhere appears to have addressed this question. Accordingly, the Court will briefly analyze the issue. In the absence of a specific statutory provision directing courts to look to state law (as with 42 U.S.C. § 1988 in Title VII cases), courts have looked to federal common law to determine the survivability of an action created by federal statute. *See, e.g., Smith v. Dept. of Human Servs.*, 876 F.2d 832, 834 (10th Cir. 1989) (applying federal common law to the survival of a claim

6

under the Age Discrimination in Employment Act ("ADEA")); *Fariss v. Lynchburg Foundry*, 769 F.2d 958, 962 n.3 (4th Cir. 1985) (applying federal common law to determine survival of ADEA claim); *Acebal v. U.S.*, 60 Fed. Cl. 551 (Fed. Cl. 2004) (applying federal common law to survival or Fair Labor Standards Act ("FLSA") claim); *Kulling v. Grinders for Indus., Inc.*, 115 F. Supp. 2d 828 (E.D. Mich. 2000) (applying federal common law to ADEA claim); *Asklar v. Honeywell, Inc.*, 95 F.R.D. 419, 422-23 (D. Conn. 1982) (applying federal common law to survival of ADEA claim).

Federal common law has consistently recognized that actions that are penal in nature do not survive a plaintiff's death. *Smith*, 876 F.2d at 834-35 (citing *Schreiber v. Sharpless*, 110 U.S. 76, 80 (1884)). The Sixth Circuit developed a three factor test in *Murphy v. Household Finance Corp.*, 560 F.2d 206 (6th Cir. 1977) to determine whether a cause of action is remedial or punitive in nature. Courts examine a statute according to the following factors: (1) whether the purpose of the action is to redress individual wrongs to the public, (2) whether the recovery runs to the individual or to the public, and (3) whether the recovery is disproportionate to the harm suffered. *Murphy*, 560 F.2d at 208. An application of the *Murphy* test convinces this Court that the FMLA is remedial in nature. First, the primary purpose of the FMLA is

> to allow employees to balance their work and family life by taking reasonable unpaid leave for medical reasons, for the birth or adoption of a child, and for the care of a child, spouse, or parent who has a serious health condition. The Act is intended to balance the demands of the workplace with the needs of families, to promote the stability and economic security of families, and to promote national interests in preserving family integrity.

29 C.F.R. § 825.101. Second, recovery under the FMLA benefits the individual bringing the claim, not the general public. 29 U.S.C. § 2617. Third, the recovery authorized under the FMLA is not disproportionate in nature. Although the FMLA contains a liquidated damages

7

provision, such an amount is limited to the amount of compensatory damages available, which is generally "wages, salary, employment benefits, or other compensation denied or lost . . . by reason of the violation."  29 U.S.C.  § 2617(a)(1)(A)(i).  Therefore, Turner's cause of action under the FMLA survives.

As to the liquidated damages claim, the Court has searched for case law interpreting the FMLA and found very little.  However, the Sixth Circuit stated in *Arban v. West Publishing Corp.*, 345 F.3d 390, 407-08 (6th Cir. 2003) that "this court previously has turned to the [FLSA], which contains similar remedial provisions, for guidance in interpreting the FMLA."  Indeed, "the legislative history of the FMLA reveals that Congress intended the remedial provisions of the FMLA to mirror those in the FLSA." *Frizzell v. Southwest Motor Freight*, 154 F.3d 641, 644 (6th Cir. 1998) (citing S. Rep. No. 103-3, at 35 (1993), reprinted in U.S.C.C.A.N. 3, 37 ("[The FMLA's] enforcement scheme is modeled on the enforcement scheme of the FLSA . . . the relief provided in [the] FMLA also parallels the provisions of the FLSA.")).  In addition, in *Blanton v. City of Murfreesboro*, 856 F.2d 731, 737 (6th Cir.1988), the court stated that liquidated damages under the FLSA are "not designed to be punitive in nature, but, rather, compensatory."  (citing *Marshall v. Brunner*, 668 F.2d 748, 753 (3d. Cir.1982).  *See also Acebal*, 60 Fed. Cl. At 556-57 (liquidated damages provisions of FLSA are not penal in nature); *Rhoads v. Fed. Deposit Ins. Corp.*, 956 F. Supp. 1239 (D. Md. 1997), aff'd in part and vac'd in part on other grounds, 257 F.3d 373 (4th Cir. 2001) (FDIC not exempt from liquidated damages under the FMLA by virtue of a statute exempting FDIC from "penalties or fines," because FMLA liquidated damages are compensatory, not punitive in nature).  *But see Johnson v. Honda of Am. Mfg.*, 221 F. Supp. 853 (S.D. Oh. 2002) (stating that liquidated damages provision under the FMLA operates to punish a

defendant).  Although the Court is mindful of *Trans World Airlines v. Thurston*, 469 U.S. 111 (1985), in which the Supreme Court held that liquidated damages under the ADEA are punitive in nature, and of subsequent cases holding that liquidated damages claims under the ADEA do not survive a plaintiff's death, *see Hawes v. Johnson and Johnson*, 940 F. Supp. 697, 703 (D.N.J. 1996), the Court believes the cases interpreting the FLSA are more relevant to the question at hand.  Accordingly, the Court holds that Turner's claim for liquidated damages under the FMLA survives.

III.

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The Court views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  To withstand summary judgment, the non-movant must present sufficient evidence to create a genuine issue of material fact.  *Klepper v. First Am. Bank*, 916 F.2d 337, 342 (6th Cir. 1990).  A mere scintilla of evidence is insufficient; "there must be evidence on which the jury could reasonably find for [the non-movant]."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

IV.

9

Under the KCRA, it is unlawful for an employer to "discharge any individual, or otherwise discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment . . . because the person is a qualified individual with a disability . . . ." Ky. Rev. Stat. Ann. § 344.040(1).  Because the language of the relevant portion of the KCRA mirrors the language of the Americans with Disabilities Act ("ADA"), the Court analyzes Turner's disability claims by reference to the ADA.  *Brohm v. JH Properties, Inc.*, 149 F.3d 517, 520 (6th. Cir. 1998).

To establish a prima facie case under the ADA, a plaintiff must show: (1) that she has a disability; (2) that she was otherwise qualified for her position; and (3) that the employer subjected her to discriminatory treatment solely by reason of her disability.  *Monette v. Electronic Data Systems Corp.*, 90 F.3d 1173, 1178 (6th Cir.1996).  If an employee establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for firing her.  *Maddox v. University of Tennessee*, 62 F.3d 843, 846 (6th Cir. 1995). Assuming that such a reason is given, the burden then shifts back to the employee to offer evidence that the proffered reason was a mere pretext designed to mask discriminatory intent. *Id*.

### A.

As an initial matter, Sullivan argues that Turner is judicially estopped from pursuing any disability discrimination claims because her social security benefits application represented that she became unable to work after January 20, 2003.  While it is true that "pursuit, and receipt, of SSDI benefits does not automatically estop the recipient from pursuing a [discrimination] claim," a plaintiff "cannot simply ignore her SSDI contention that she was too disabled to work."

*Cleveland v. Policy Mgt. Sys. Corp.*, 526 U.S. 795, 798 (1999).  To survive a defendant's motion

for summary judgment, a plaintiff must "explain why that SSDI contention is consistent with her

ADA claim that she could perform the essential functions of her previous job, at least with

reasonable accommodation." *Id.* (internal quotation marks omitted).  The Sixth Circuit has

reiterated after the *Cleveland* decision that

> In determining precisely what the plaintiff 'admitted' in the application, one
> must consider the context in which the statements were made.  Portions of the
> [SSDI] application and other forms require the applicant merely to check off
> boxes without comment, or require the applicant to fill in blanks with little
> room given for elaboration.  In short, the employee may not have a fair
> opportunity to accurately explain the details of the employee's medical
> condition and his ability or inability to work for purposes of [the disability
> discrimination laws].

*Kiely v. Heartland Rehabilitation Services, Inc.*, 359 F.3d 386, 390 (6th Cir. 2004), citing

*Griffith v. Wal-Mart Stores, Inc.*, 135 F.3d 376, 382 (6th Cir. 1998).  As Turner is deceased, she

is unavailable to offer an explanation for her statement.

A "disability" under the Social Security Act ("SSA") is "an inability to engage in any

substantial gainful activity by reason of any . . . physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous period

of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The impairment must be "of such

severity that [a claimant] is not only unable to do his previous work but cannot . . . engage in any

other kind of substantial gainful work . . . in the national economy."  42 U.S.C. § 423(d)(2)(A).

Turner listed the date of her cancer diagnosis as the date she became unable to work.  Indeed,

during her initial treatment, Turner did not work from January until June of 2003.  However,

Turner returned to work from June 2003 through December 2003, and she also taught for a

semester at the University of Louisville from August 2004 to December 2004.  Further, Turner

11

did not apply for disability benefits until December 2004, and she did not receive benefits until April 2005.  Turner's counsel speculates that she made a mistake on her application by listing the date of her diagnosis rather than the date she became unable to engage in "substantial gainful work" within the meaning of the SSA.

Resolving all inferences in favor of the Plaintiff, Turner was clearly not disabled within the meaning of the SSA at the time she worked for Sullivan, as she taught at Sullivan until the date of her termination and even thereafter for the University of Louisville.  In addition, Turner did not receive disability benefits until well after her employment with Sullivan had ceased.  The Court concludes that Turner's representations in her disability benefits application do not judicially estop her disability claims.

B.

To show the first element of a prima facie case, her disability, Turner may show: (1) a physical or mental impairment that substantially limited one or more of her major life activities; (2) a record of such an impairment; or (3) that her employer regarded her as having such an impairment.  Ky. Rev. Stat. Ann. § 344.010(4); *Hallahan v. Courier-Journal*, 138 S.W.3d 699, 707 (Ky. Ct. App. 2004).  Turner's cancer could qualify as an impairment under the KCRA and the ADA.  *Bragdon v. Abbott*, 524 U.S. 624, 633 (1998).  Turner explicitly states that she is arguing only that she was actually disabled, not that she had a record of a disability or that she was regarded as disabled.  Therefore, the more specific question is whether the cancer substantially limited her in one or more major life activities.  Those major life activities include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working."  29 C.F.R. § 1630.2.  The term "substantially limits"

12

means: "(i) unable to perform a major life activity that the average person in the general population can perform; or (ii) significantly restricted as to the condition, manner, or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity."  29 C.F.R. § 1630.2(j)(1).  Factors relevant to the substantiality of the limitation are the nature and severity of the impairment, the duration of the impairment, and the permanent or long-term impact of the impairment.  29 C.F.R. § 1630.2(j)(2).

In *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 198 (2002), the Supreme Court held that "to be substantially limited in performing manual tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives."  The Sixth Circuit has stated that the Court in *Williams* "emphasized that the term 'substantially limits' should be 'read strictly to create a demanding standard for qualifying as disabled.'"  *Mahon v. Crowell,* 295 F.3d 585, 590 (6th Cir. 2002) (quoting *Williams*, 534 U.S. at 197).  The existence of cancer is not by itself determinative of a disability as a matter of law.  Whether Turner's cancer is a qualifying disability is an individualized inquiry to be determined on a case-by-case basis.  *See Sutton v. United Airlines, Inc.*, 527 U.S. 471 (1999).

Turner specifically disclaims that "working" constituted one of her limited major life activities.  Rather, Turner lists a number of specific limited activities between March 2003 and November 2003:

- picking up her daughter and putting the child in a swing;
- taking out the garbage unless the garbage was in small bags;

13

- housework and vacuuming;
- carrying computers, books, and notebooks, and items related to her profession;
- grocery shopping by herself;
- yard work and gardening;
- standing up for a long period of time;
- riding in a car for long distances;
- doing large loads of laundry;
- cooking that involved lifting heavy pots; and
- playing with her children.

Each of these activities typically involves some form or another of lifting. Review of many cases reveals that evidence of a disability requires greater proof than merely the inability to perform incidental though important life activities that involve lifting.[5] While Turner's deposition testimony plainly reveals the ultimate effects of cancer and its treatment, none of the activities listed above amount to a substantial limitation of a "major life activity" within the meaning of the KCRA or the ADA. While Turner's cancer may have been a disability during her time on leave, it surely was not when she returned to work. Turner has failed to identify and establish a limitation of any major life activity at the times relevant to her claims. Without the identification and proof of such a limitation, Turner cannot establish a prima facie case.

---

[5] *See, e.g., Howard Baer, Inc. v. Schave*, 127 S.W.3d 589 (Ky. 2004) (restriction on lifting objects over forty pounds did not constitute substantial limitation on a major life activity); *Olds v. United Parcel Service*, 127 Fed. Appx. 779 (6th Cir. 2005) (unpublished) (the general rule in the Sixth Circuit is that a lifting restriction alone is not considered a disability under the ADA); *Ellison v. Software Spectrum, Inc.*, 85 F.3d 187, 190 (5th Cir. 1996) (breast cancer that required chemotherapy and treatment which caused the plaintiff to experience significant side effects did not qualify as a disability); *Gordon v. E.L. Hamm & Assocs., Inc.*, 100 F.3d 907 (11th Cir. 1996) (plaintiff's breast cancer did not substantially limit his ability to care for himself or work); *Pimental v. Dartmouth-Hitchcock Clinic*, 236 F. Supp. 2d 177 (D.N.H. 2002) (plaintiff's lifting restriction, concentration impairment, hot flashes, and other effects as a result of breast cancer did not substantially limit her in a major life activity); *Schwertafer v. City of Boynton Beach*, 42 F. Supp. 2d (S.D. Fla. 1999) (plaintiff's breast cancer did not substantially limit her in major life activities, even though her surgery caused her to be temporarily unable to care for, dress, and cook for herself); *Madjlessi v. Macy's W., Inc.*, 993 F. Supp. 736 (N.D. Cal. 1997) (employee's breast cancer did not substantially limit her ability to work); *Schaller v. Donelson Air Conditioning Co.*, 2005 WL 1868769 (M.D. Tenn. 2005) (employee failed to establish major life activity in which he was limited as a result of his breast cancer). *But see Leicht v. Hawaiian Airlines, Inc.*, 77 F. Supp. 2d 1134 (D. Haw. 1999) (Plaintiff's cancer was a disability while she was on leave, but she failed to demonstrate that she was disabled when she was terminated because she had returned to work with no restrictions).

14

V.

The KCRA prohibits an employer from discriminating against an employee "with respect to compensation, terms, conditions, or privileges of employment, because of the individual's sex."  Ky. Rev. Stat. Ann. § 344.040(1).  The term "on the basis of sex" includes pregnancy, childbirth, and related medical conditions.[6]  Ky. Rev. Stat. Ann. § 344.030(8).  The Court will use the federal Title VII standards to evaluate Turner's claim.  *Smith v. Leggett Wire Co.*, 220 F.3d 752, 758 (6th Cir. 2000), *Meyers v. Chapman Printing Co, Inc.*, 840 S.W.2d 814, 821 (Ky. 1992).  To prevail on a pregnancy discrimination claim, Turner must establish that (1) she was pregnant, (2) she was qualified for her job, (3) she was subject to an adverse employment action, and (4) there was a nexus between her pregnancy and the adverse employment action.  *Prebilich-Holland v. Gaylord Entertainment Co.*, 297 F.3d 438 (6th Cir. 2002) (citing *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 658 (6th Cir. 2000)).

Where a plaintiff's proof of the fourth element of the prima facie case – causal connection – is based on indirect evidence, courts employ the familiar burden-shifting analysis set forth in *McDonnell Douglas Corp v. Green*, 411 U.S. 792 (1973).  *Prebilich-Holland*, 297 F.3d at 442.  Under this framework, Turner must first prove a prima facie case.  *McDonnell Douglas Corp.*, 411 U.S. at 802.  Turner argues, however, that "there is direct evidence, in the form of testimony of both Daniel and Watkins, that unlawful considerations were causative factors in adverse actions against [Turner]" (Pl.'s Resp. to Mot. for Summ. J. 15), and that the *McDonnell Douglas* framework is therefore inapplicable.  Direct evidence "is that evidence

---

[6] Turner makes no argument for a sex discrimination claim based on her gender alone – all of Turner's arguments refer to a "sex/pregnancy" discrimination claim, and she has alleged no facts that would support a claim of sex discrimination other than based on pregnancy.  Accordingly, the Court will consider Turner's sex discrimination claim to be based on her pregnancy.

15

which, if believed, allows a direct inference that unlawful discrimination was at least a motivating factor in the employer's actions." *Jackson v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999).  Turner fails to identify, however, any particular testimony that would constitute direct evidence of discrimination.   The Court has closely scrutinized the record and has found no direct evidence of discrimination.[7]  Accordingly, the Court will use the *McDonnell Douglas* framework in analyzing these claims.

The first two elements are satisfied – Turner was female and was pregnant twice during her employment, and she was otherwise qualified for her position, as she had been a full-time instructor at Sullivan since 1998.  Next, the Court must determine whether any of Sullivan's actions could constitute adverse employment actions.  Certainly, Turner's termination qualifies as such an action.  Sullivan argues that none of the other alleged actions so qualify.  The Court will address those remaining actions.

## A.

Not every act affecting an individual's employment is considered an adverse

---

[7] For example, Daniel's statement in the unemployment hearing on February 3, 2004 that he was aware that Turner was pregnant and that her pregnancy was a "strong consideration" in assigning her to teach five English 101 classes during the Summer 2003 Quarter is not facially discriminatory, as the statement is taken out of context. (Unemp. Tr. 54).  The testimony immediately preceding this statement indicates that Daniel's stated reason for assigning Turner the English 101 classes was because it is a relatively simple matter for one instructor to substitute for another in the English 101 class, in contrast to higher-level classes, which was a relevant consideration if Turner was to be out for any meaningful period of time.  Daniel elaborated "[S]ince I was not aware of what her health situation was, and it had not been communicated to me, I had to do what I felt was basically best for my job and my students."  In short, the statement that the pregnancy was a "strong consideration" in assigning Turner English 101 classes requires an inference to determine that Daniel was discriminating against Turner because of her pregnancy in assigning classes.  The situation here seems somewhat analogous to that in *Kocak v. Community Health Partners of Ohio, Inc.*, 400 F.3d 466 (6th Cir. 2005)(en banc).  In that case, the Sixth Circuit held that an employer's statement that scheduling difficulties resulting from a former employee's pregnancy were a factor in the employer's decision not to rehire the former employee was not direct evidence of discrimination based on the employee's pregnancy.  Further, even if one assumes that Daniel's statement is facially discriminatory, assigning Turner a class schedule that was not to her liking does not amount to an adverse employment action.  The statement is not direct evidence that discrimination based on Turner's pregnancy motivated either of the adverse actions at issue in this case – the Contract and the termination.

employment action.  *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).  The

adverse action requirement is designed to filter out cases involving mere "inconvenience" or a

"bruised ego."  *White v. Burlington N. & Santa Fe Ry. Co*., 364 F.3d 789, 795 (6th Cir. 2004) (en

banc), *cert granted in part*, --- U.S. ---, 126 S. Ct. 797 (2005).  Similarly, the mere fact that an

employee is unhappy about a workplace decision does not establish an adverse action.  *Primes v.

Reno*, 190 F.3d 765, 767 (6th Cir. 1999).  Rather, an adverse employment action must be a

"materially adverse change in the terms and conditions of [plaintiff's] employment."  *Hollins v.

Atl. Co.*, 188 F.3d 652, 662 (6th Cir. 1999).  In general, "reassignments without salary or work

hour changes do not ordinarily constitute adverse employment decisions in employment

discrimination claims."  *Kocsis v. Multi-Care Mgmt., Inc.,* 97 F.3d 875, 885 (6th Cir. 1996).

However, such reassignments may be considered adverse employment actions where they

amount to a demotion, as evidenced by a "less distinguished title, a material loss of benefits,

significantly diminished material responsibilities, or other indices that might be unique to a

particular situation."  *Id.* at 886.

         As best the Court can discern from the pleadings, Turner argues that the following

constituted adverse employment actions:  (1) requirement to attend Plus Fridays beginning in

October 2002, (2) assignment to teach low-level classes during the Winter 2003 Quarter , (3)

assignment to teach low-level classes during the Summer 2003 Quarter, (4) assignment to teach

low-level classes in the Fall 2003 Quarter, (5) exclusion from a general education meeting in

Lexington, Kentucky in the summer or fall of 2003, (6) the offer of only a 1% pay increase in

October 2003, (7) the offer of only a six-month contract in October 2003, (8) Daniel's abusive

treatment, and (9) her termination.

1.

Daniel required Turner to attend Plus Fridays (Action # 1).  Indeed, Turner's employment contract expressly stated that "the faculty member hereby agrees . . . to be present for Plus Fridays . . . as a continuing condition of employment."  Consequently, Daniel's insistence that Turner do what she agreed upon simply does not constitute a "materially adverse change in the terms and conditions of [Turner]'s employment."  *Kocsis*, 97 F.3d at 885.  Turner argues that some other instructors were not required to attend Plus Fridays.  Even if this is true and even if requiring Turner to attend was spiteful and unnecessary, the Court concludes that the action does not constitute an adverse action under the relevant case law.

2.

The Court is similarly not persuaded that exclusion from a meeting in Lexington and general abusive conduct (Actions # 5 and 8) constitute adverse employment actions.  These incidents could be deemed petty and spiteful occurrences.  However, Turner has not presented evidence of their severity such that they actually changed the terms and conditions of her employment.  *See Kocsis*, 97 F.3d at 885.  Indeed, Sullivan's explanation is that Turner's presence was no longer required at the general education meeting once she resigned as Chair of the English Department.  Turner offers no evidence to contradict Sullivan's proffered reason.  Turner presents no evidence that these actions diminished her duties, stature or benefits.

18

3.

The issue of unfavorable class schedules (Actions # 2, 3, and 4) present a somewhat closer question.  Generally, a university may assign its professors to teach classes according to its needs.[8]  Nevertheless, a class assignment could materially and adversely affect employment when such assignment results in "a less distinguished title, a material loss of benefits, [or] significantly diminished responsibilities."  *Kocsis*, 97 F.3d at 995.  Turner has presented no evidence of any materially adverse consequences of the class schedules.  An illustrative comparison is *Gupta v. Florida Bd. of Regents*, 212 F.3d 571 (11th Cir. 2000), in which the court held that there was no adverse employment action where a university did not assign a professor a class she wished to teach.  As is true here, the professor in *Gupta* "presented no evidence at all that she was in any way entitled to or particularly deserving of that class, as opposed to the classes she was assigned to teach, or that other . . . professors routinely got to cherry-pick the classes they taught."  *Id.* at 588.  *See also Galabya v. New York City Bd. of Educ.*, 202 F.3d 636 (2d. Cir. 2000) (No adverse action where board of education transferred an instructor from special education keyboarding classes in junior high to mainstream keyboarding classes in high school); *Ticali v. Roman Catholic Diocese of Brooklyn*, 41 F. Supp. 2d 249 (E.D.N.Y. 1999), *aff'd*, 201 F.3d 432 (2d. Cir. 1999) (No adverse action where diocese transferred a teacher from first grade to pre-kindergarten).  Therefore, the Court finds no basis for concluding that the schedule changes here constitute an adverse employment action under existing precedent.

---

[8] Although not determinative of the issue, it is relevant that Sullivan offers a relatively limited number of English classes.  Daniel testified that "there are only 3 courses and some electives, English 101, 102 and 204," in addition to the remedial English 100 course. (Unemp. Tr. 51).  In addition, Daniel testified that he had taught five remedial classes in a prior quarter, and that every instructor other than Turner had taught the remedial course at least once before.  (Unemp. Tr. 61).

4.

The offer of a six-month contract and only a one percent raise (the "Contract"), rather than her customary year-long contracts and four percent raises, (Actions # 6 and #7) presents the strongest evidence of an adverse employment action.  These new terms were less favorable than Turner's previous terms and conditions of employment.  Although Sullivan certainly has discretion in the contracts it gives its instructors, its practice since 1998 had been to give Turner a year-long contract and a raise of approximately four percent.  To suddenly change these terms to six months and one percent is certainly materially less favorable than the terms to which Turner was accustomed and expected to receive.  *See, e.g. Coleman v. Wayne State Univ.*, 664 F. Supp. 1082 (E.D.Mich. 1987) (denial of merit pay increases actionable in disparate treatment claim), *Gutzwiller v. Fenik*, 860 F.2d 1317 (6th Cir. 1988) (denial of tenure actionable in sex discrimination case).  Thus, the Court has determined that both the Contract and termination are adverse employment actions.

B.

Turner must now show a nexus between her pregnancy and the Contract or her termination, or evidence that she was treated differently than a similarly situated male instructor regarding the Contract.  She testified that Daniel told her he was concerned about her "lack of availability" and that her twelve absences in the prior quarter were "one reason" for the contract offered.  While the statements are not facially discriminatory, they are sufficient to shift the burden to Sullivan to articulate a legitimate, nondiscriminatory reason for the Contract and termination, because at least some of Turner's "lack of availability" was due to her pregnancies. *See Cline*, 206 F.3d at 658.

20

To satisfy its burden, Sullivan cites Daniel's testimony that he offered Turner the Contract because of her attitude.  He said that Turner should use the six-month term to rethink her attitude or find a new job.  Sullivan states that it terminated Turner because she failed to sign the proffered contract.[9]  These legitimate, nondiscriminatory reasons shift the burden to Turner to provide evidence that Sullivan's stated reasons were pretextual and a mask for discrimination.  Turner need not provide direct evidence of discrimination; rather, "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."  *Reeves v. Sanderson*, 530 U.S. 133, 148 (2000).  Turner points to Daniel's statements regarding her lack of availability as evidence that her attitude was not the reason for the Contract.  In addition, Turner testified that she had worked for Sullivan in the past for brief intervals without a Contract,[10] and that her failure to sign the Contract therefore could not have been the real reason for her termination.  These statements, if believed, are sufficient evidence from which a reasonable jury could determine that the real reason for the Contract and termination was Turner's pregnancies, as her lack of availability was due in part to her pregnancies.   Accordingly, Sullivan's motion for summary judgment on Turner's pregnancy discrimination claim is denied.

## VI.

Turner claims that Sullivan terminated her based on her opposition to the Contract, namely her statements that the Contract was illegal and unfair, and that she would be contacting

---

[9] Sullivan's Faculty/Staff Manual states that all full-time instructors must have an employment contract, and the testimony of Dr. Watkins confirms that no full-time instructor was permitted to work for an indefinite period of time without a contract.

[10] For example, if a Contract expired, Turner would continue working and a subsequent contract would simply be made effective as of the date of the expiration of the prior contract.

an attorney.  The KCRA prohibits an employer from retaliating against an employee for opposing a practice unlawful under the Act.  Ky. Rev. Stat. Ann. § 344.280(1).  Retaliation claims under the KCRA are interpreted the same way as Title VII retaliation claims.  *Mountain Clay, Inc. v. Comm'n on Human Rights*, 830 S.W.2d 395, 396 (Ky. Ct. App. 1992).  In order to establish a prima facie case of retaliation, Turner must demonstrate that (1) she engaged in a protected activity under Title VII, (2) Sullivan knew about the exercise of her rights, (3) she suffered an adverse employment action, and (4) a causal connection between the protected activity and the adverse employment action.  *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).  Opposing a practice by an employer that is unlawful under the KCRA constitutes a "protected activity."  *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 578 (6th Cir. 2000).  All that is required is that Turner have reasonably believed that she was opposing an unlawful employment practice, not that Sullivan's employment practice actually was unlawful.  *See Johnson*, 215 F.3d at 579-80.

Turner satisfies the first three elements:  her statements regarding the Contract and her attorney's letter to Sullivan are protected activity, Sullivan was certainly aware of both, as it responded to Turner's letter by counsel shortly before her termination, and the termination itself was an adverse employment action.  To establish a causal connection between the protected activity and the termination, Turner must produce sufficient evidence to permit a reasonable inference that the exercise of the protected activity caused the termination.  *Nguyen*, 229 F.3d at 563.  No one factor is dispositive.

Here, Turner's evidence of causal connection is (i) the temporal proximity of her termination and her opposition to the Contract (less than one month passed between Sullivan's

22

receipt of the letter from Turner's attorney and the termination), and (ii) statements of Daniel and Watkins in their depositions and at the unemployment hearing to the effect that they were aware of the letter from Turner's attorney and believed Turner was serious about filing a lawsuit.[11] Evidence of temporal proximity between the protected activity and the termination is relevant to causation.  *Id.*  Turner's evidence, if believed, is sufficient to support an inference of causation.

Accordingly, Sullivan once again cites Turner's attitude and her failure to sign the Contract as a legitimate nondiscriminatory reason for the termination.  To show pretext, Turner again points to evidence that she has worked for Sullivan without a contract for relatively brief periods in prior years.  This evidence calls into question Sullivan's stated reasons.  The evidence in Turner's prima facie case, "combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."  *Reeves*, 530 U.S. at 148.  Here, Turner has provided sufficient evidence from which a reasonable juror could conclude that Sullivan's reason for terminating Turner was not her attitude and her failure to sign the Contract, but was instead in retaliation for engaging in protected activity.

VII.

The FMLA entitles an eligible employee to up to twelve weeks of unpaid leave during any twelve-month period for, among other things, (i) the birth of a child and to care for such child, and (ii) because of a serious health condition that makes the employee unable to perform the functions of the position of such employee.  29 U.S.C. § 2612(a)(1)(A) and (D).  There are

---

[11] For example, Daniel stated at the unemployment hearing "Plus, there had been a letter from [Turner's] lawyer to the President of the school.  It just seemed like the situation was not going to go away."  (Unemp. Tr. 35).

two distinct theories for recovery under the FMLA:  the (1) interference theory and the (2) retaliation theory.

A.

The "interference or "entitlement" theory, which arises from § 2615(a)(1), states that "it shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or attempt to exercise, any right provided under [the FMLA]," and from § 2614(a)(1), which provides that "any eligible employee who takes leave . . . shall be entitled, on return from such leave (A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or (B) to be restored to an equivalent position."  29 U.S.C. §§ 2615(a)(1) and 2614(a)(1).[12]

To prevail on an interference claim, Turner must establish that (1) Turner was an eligible employee under 29 U.S.C. § 2611(2), (2) Sullivan was an "employer" under 29 U.S.C. § 2611(4), (3) Turner was entitled to leave under the FMLA, (4) Turner gave Sullivan notice of her intention to take leave, and (5) Sullivan denied Turner FMLA benefits to which she was entitled.  *Cavin v. Honda of America Mfg., Inc.*, 346 F.3d 713, 720 (6th Cir. 2003).  Clearly, Sullivan provided Turner all of the FMLA leave to which she was entitled, along with a substantial additional amount of leave.  Each time Turner returned from leave, she was restored to her position as a full-time instructor in accordance with the requirements of 29 U.S.C. § 2614(a)(1).  To the extent Turner alleges that certain events that occurred after her leave constituted adverse employment actions, those are more properly analyzed under the

---

[12] The "entitlement" or "interference" theory "is derived from the FMLA's creation of substantive rights.  If an employer interferes with the FMLA-created right to . . . leave or to reinstatement following the leave, a violation has occurred."  *Arban v. West Publishing Corp.*, 345 F.3d 390, 401 (6th Cir. 2003) (citing *King v. Preferred Technical Group*, 166 F.3d 887, 891 (7th Cir. 1999)).

24

"retaliation" or "discrimination" theory for FMLA claims.  However, Sullivan did not interfere with or deny any of Turner's substantive rights or entitlements under the FMLA..

B.

The "retaliation" or "discrimination" theory arises from § 2615(a)(2), which provides that "[i]t shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter."  29 U.S.C. § 2615(a)(2).  Specifically, an employer is "prohibited from discriminating against employees . . . who have used FMLA leave," nor can they "use the taking of FMLA leave as a negative factor in employment actions."  29 C.F.R. § 825.220(c).  *See also Arban*, 345 F.3d at 403.  To establish a prima facie case for FMLA retaliation, Turner must demonstrate that 1) she engaged in conduct protected by the Act, (2) Sullivan was aware of this exercise of protected rights, (3) Sullivan took an employment action adverse to her, and (4) there was a causal connection between the protected activity and the adverse employment action.  *See Saroli v. Automation & Modular Components, Inc.*, 405 F.3d 446, 451 (6th Cir. 2005) (citing *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 314 (6th Cir. 2001)).  Because Turner's proof of causal connection is based on indirect evidence, this Court employs the *McDonnell Douglas* framework.  *Skrjanc*, 272 F.3d at 315.

It is undisputed that elements one and two are satisfied – Turner took FMLA leave and Sullivan was aware of such leave.  As discussed above, both the offer of a reduced contract and Turner's termination are adverse employment actions that satisfy the third element.  To show a causal connection, Turner again points to Daniel's statements regarding her "lack of availability" when he gave her the Contract.  Obviously, some of her "lack of availability" was due to her

25

FMLA leaves.  This evidence is sufficient to establish a prima facie case.  Sullivan's stated legitimate nondiscriminatory reasons for firing Turner are her failure to sign the Contract and her attitude.  Turner again points to her prior periods of employment without an employment contract as evidence of pretext.  As with the pregnancy discrimination claim, Turner's evidence of pretext, if believed and when combined with the evidence supporting the prima facie case, is sufficient evidence from which a reasonable jury could find that Sullivan retaliated against Turner for exercising her FMLA rights.

The Court will enter an order consistent with this Memorandum Opinion.

cc:      Counsel of Record